### MISSOURI, KANSAS & TEXAS RAILWAY COMPANY
### v. V. E. CARTER.
### No. 1130.

1. **Conditions in Shipping Contract.**—A stipulation in a freight contract for carrying cattle, providing that the shipper should sign and furnish a statement to each conductor on the route, showing condition of the cattle, and that a failure to so report should be conclusive evidence that the cattle were in good condition, is unreasonable and of no effect.

2. **Stipulated Time for Notice of Claim for Damages.**—A stipulation in a freight contract, that notice of claim for damages should be presented within thirty days after the injury, must yield to the law of March 4, 1891 (Laws Twenty-second Legislature, page 20), then existing, and forbidding such limit. The stipulation was unlawful and void.

3. **Contract to Give Notice of Place and Nature of Injuries.**—So also is a provision in a freight contract unreasonable that required the shipper to give notice to the conductor or station agents of the nature and the place of the injuries received by the cattle.

4. **Parol Freight Contract—Written Contract.**—The shipper agreed with an agent of the railroad company upon terms for carrying his cattle from Maxwell, Texas, to East St. Louis, Ill. The cattle were delivered for carriage, and were loaded upon the train under and in accordance with the parol contract. When the train was about starting, a written contract was presented to the shipper for his signature. He examined so far as to know that the rate was as agreed upon, and then signed it, not knowing that it contained onerous conditions against him. There was no consideration for his signing the written contract. *Held*, that such writing did not supply the place of the parol contract, and was not binding upon the shipper.

5. **Same.**—A written instrument signed by the shipper may be explained by evidence showing the true situation of the parties and the true contract under which the shipment was made. When it is shown that the shipper relied upon a parol agreement of shipment and upon the common law liability of the carrier, a written contract changing the liability of the carrier should not prevail, when the shipper did not know its contents or assent to its terms. In such cases, the presumption arising from the fact that he signed it may be rebutted, and want of assent and mutuality shown.

6. **Want of Consideration.**—The liability of the carrier had become fixed under the parol contract for shipment; its duty was to ship the cattle and safely deliver them. A written contract subsequently signed materially advantageous to the carrier without consideration would not revoke the parol contract. These facts may be shown in avoidance of such written contract when invoked as defense against liability under the parol contract. Want of consideration may be pleaded and proved.

7. **Duties of Railroads.**—The duty of railroads to the public and the shipper requires that obligations and engagements which they enter into for transportation shall be based upon contracts that are essentially fair, just, and reasonable, not only to the carrier but to the shipper. The unequal positions of the parties in their con-tractual relations to each other commends the wisdom of the rule that requires the carrier to deal fairly with the shipper, and prevents it from imposing unfair contracts upon him.

8. **Contract Made Under Duress.**—The shipper, under circumstances shown in this case, was in some respects under duress as affecting his property when he was forced to the alternative of signing such a contract, or being denied transportation to the desired market, by the carrier. It was the duty of the carrier to give the op-portunity to ship under terms such as would hold the carrier to its common law duties in the premises, or of the verbal contract under which the cattle were delivered. Duress may apply to property as well as to the person. ˙ See illustration.

APPEAL from Caldwell. Tried below before Hon. J. NIX, Special District Judge.

*Storey & Storey,* for appellant.—1. Conditions precedent, and limi-·tation of liability in a contract for shipment of cattle beyond the limits of the State, if easy and reasonable.to be complied with, are legal, and a failure to comply with these on the part of the shipper .will defeat an action for damages growing out of said contract. Re-port of condition of stock to the conductor on the train, notice of injury to the local freight agents along the route, and notice of claim for damages to the agent at the terminal point of the line upon which damage occurred, are instances of reasonable limitation and conditions. Railway v. Baird, 75 Texas, 256; McCarn v. Railway, 84 Texas, 352, and cases cited.

· 2. There was no verbal contract for the shipment of the cattle, and neither party made or intended to make, or thought he had made, such a contract; but both parties knew that the contract of shipment was to be made and must be in writing, and both parties intended to make and did make a written contract, and everything which passed between them was simply in the nature of negotiation leading up to the con-tract which each knew must be, and which each intended to, and which each did reduce to writing and sign.

3. The question as to whether or not conditions in a contract are reasonable is a question for the jury to decide, under proper instruc-tion from the court, but it is incumbent upon the court to instruct the jury what in law would constitute a reasonable contract or condition in a contract, and what would render a contract or condition in a con-tract void is a question of law.

4.  The question of whether or not there was duress is a question for the jury.   As to what constitutes duress is a question of law that must be determined by the court, and he must have instructed the jury as to what would have constituted duress before authorizing them to find the fact, and the court would not then have been authorized to submit that question to the jury unless there had been a plea of duress, and unless there had been some evidence to sustain said plea.

*Stringfellow & Coopwood,* for appellee.—1.   Conditions precedent and limitations of liability for shipment of cattle beyond the limits of the State are legal or valid only (1) when they do not appear on the face of the contract to be unreasonable; (2) when they are alleged and proved to be fair and reasonable, the burden of proof of which is upon the carrier; (3) when it is proved that the shipper did not enter into the contract under duress, but that he had the option of electing to have his property transported by the carrier under a limited liability or under its common law liability, the burden of proving which is on the carrier; (4) when such limitations and conditions are not imposed upon the shipper by fraud or imposition; (5) when existing rights and liabilities are not changed, waived, or defeated by such conditions and limitations, or if existing rights and liabilities are changed, waived, or defeated by such conditions or limitations, then only when such conditions or limitations are supported by a valuable consideration.   Railway v. McCarty, 82 Texas, 608; Railway v. Wright, 1 Texas Civ. App., 402; Railway v. Lockwood, 17 Wall. (U. S.), 357, 379; Railway v. Pratt, 22 Wall., 123; Railway v. Cravens, 20 S. W. Rep. (Ark.), 803; Railway v. Stiner, 61 Ala., 559; Railway v. Coal Co., 79 Ill., 121; Railway v. Pattison, 41 Ind., 312.

2.   A stipulation for a report to conductors at the ends of divisions of the line of road of the condition of stock is unreasonable and void upon its face as matter of law, when the contract fails to inform the shipper as to where the terminal points of divisions are, and the party setting up such stipulation fails to allege where the terminal points are, and also to allege and prove that the shipper knew such terminal points.   Railway v. Harris, 67 Texas, 166; Railway v. Childers, 1 Texas Civ. App., 302; Railway v. Fagan, 72 Texas, 132; Railway v. Adams, 78 Texas, 374; Railway v. Greathouse, 82 Texas, 111; Railway v. Paine, 1 Texas Civ. App., 621.

3.   Requiring of a shipper reports of the condition of stock at the end of a division is unreasonable and void, as matter of fact, when it appears that the ends of divisions are reached at night; when it appears that these reports are demanded by the conductors while the trains are in motion, before they reach the ends of their divisions, when the contract requires the persons in charge of the stock to remain in the caboose while the trains are in motion; when it appears that the condition of stock can not be ascertained and reported while they are in the cars; and when it appears that the conductors demand that

the stock shall be reported in good condition by so filling up the blanks furnished them for such reports, and demanding the signature of the shipper thereto; and by refusing to furnish other blanks when the stock are reported to be in bad condition.

4. To require of a shipper to give notice of injury to the conductor or nearest station or freight agent at the way stations along the route is unreasonable and void, when the shipper has a contract for a special train with a through run, and can not be reasonably expected to stop at way stations; nor can he be reasonably expected to determine upon what line of railway or nearest to what station any portion of a loss or injury occurred, which was the result of seventy-five hours of confinement in cars, and which ·was distributed over a run of nearly a thousand miles, over several carriers' lines, over many divisions, and under many conductors.

5. The written agreement is void, because it was obtained by fraud and imposition, and was signed by appellee under duress. McGregor v. Railway, 35 N. J. L., 89.

FISHER, CHIEF JUSTICE.—This is an action by appellee to recover of appellant damages for failing to comply with a parol contract of shipment of cattle from Maxwell, Caldwell County, Texas, to East St. Louis, Ill. The parol contract was to the effect that the appellant agreed, for a named rate of freight, to ship appellee's cattle, with those of other parties, on a special stock train from Maxwell to East St. Louis within a certain time, and to make a special run for that purpose, and to stop so many named hours at Vinita in order to water and feed and rest the stock. The damages claimed result from the violation of this contract by appellant in failing to comply with its terms, and as a result a falling off in weight and value of the cattle and loss of the market when they should have arrived, and extra expenses, etc. In reply to this alleged contract, the appellant pleaded a written contract with the same rate of freight as that agreed upon in the parol contract, and that said cattle were to be only transported in a reasonable time, and that the appellant only agreed to be liable for what injury occurred on its own line, and that a part of the injury complained of occurred after the cattle had left its line, and set up certain terms of the contract in which the appellee had agreed to give, within a certain time, notice of its claim for damages, and had agreed to sign reports furnished by conductors of the condition of said cattle, and agreed to bring suit within a certain time or be barred, and that he would give to the station agent or conductor notice of the condition of the cattle before they should be removed or mixed with other cattle, and that the appellee had executed said written contract, and that it was binding upon him, and that its terms and conditions were reasonable, etc., and denied the execution of the parol contract and the authority of its agent to make such a contract, and that the written contract waived all parol contracts. The appellee pleaded in re-

ply, that the written contract set up by appellant was not valid and binding upon him, because at the time it was executed he was under duress, and that it was not supported by a consideration, and that its terms and conditions were unreasonable. This supplemental petition was sworn to. Verdict and judgment below was in favor of appellee.

*Opinion.*—Assuming that the written contract was supported by a consideration and was properly executed by appellee, we do not think that those provisions setting up the failure to sign and furnish a statement, to each conductor in whose charge the cattle may be placed, of their condition, and to furnish the notice of claim for damages within thirty days, and bring suit within ninety days, can be enforced. The provision requiring a report of the condition of the cattle to be made to the conductors, stipulates that a failure to furnish such a report should be conclusive evidence that the cattle were in good condition. A stipulation such as this should be held unreasonable. It makes the passive failure to do an act which might not in any case result in harm to the carrier defeat a meritorious claim of the shipper, with a result to relieve the carrier for injuries that have resulted from its negligence, and gives this passive negative act the effect of an estoppel when it may not in anywise mislead the carrier or place it in any worse condition than it would occupy if the condition was complied with. A stipulation in a contract of shipment that the shipper will be estopped, when no element of estoppel in fact may exist, is unreasonable in the eye of the law, when such a stipulation is urged in defense of a claim for damages arising from the negligence of the carrier. It would be unreasonable and unjust for a carrier to contract away its liability for its negligence in any such manner.

In Railway v. Ivy, 79 Texas, 447; Railway v. Fennell, 79 Texas, 449, and Railway v. Turner, 1 Texas Civil Appeals, 631, it is held, that the signing of statements by the carrier such as are exacted by this provision of the contract would simply be an admission of the party that signed it, which could be rebutted and explained, and that the statements contained in such reports would not estop the maker from denying their truth. No statement or report was signed by the shipper in this case, or by those that accompanied the cattle. The logic of these decisions is to the effect, that an effort to make a statement or report of this character an estoppel is unreasonable, and that it will not be so enforced; and the reason of this rule would extend to denying the effect of an estoppel to a failure to make the report of the condition of the stock. Certainly the failure to make the statement and report could have no more conclusive effect in tending to estop the shipper than would be the deliberate written statement of the shipper showing the condition of the cattle, and if the estoppel could not exist in this latter instance, it would certainly be unreasonable and illogical to hold that it would exist in the former.

This contract of shipment was entered into long after the Act of March 4, 1891, was in effect; therefore the stipulations requiring notice of the claim for damages to be presented within thirty days after the happening of the injury, and requiring suit to be brought within ninety days, are opposed to the spirit and the letter of that act, and must yield to it. Railway v. Eddins, 26 S. W. Rep., 162. In that case, it was held that this statute would apply to an interstate shipment.

Under the pleadings and facts of this case, that provision of the written contract that required the shipper to give notice to conductors or station agents of the nature and place of the injuries sustained by the cattle, does not appear to be reasonable. Stipulations of this nature —and of those just discussed—in contracts of this character are enforced against the shipper only when it appears from the facts averred and those proven that they are reasonable. Railway v. Harris, 67 Texas, 172; Railway v. Greathouse, 82 Texas, 111; Railway v. Childers, 1 Texas Civ. App., 305; Railway v. Paine, 1 Texas Civ. App., 623; Railway v. Garrett, 24 S. W. Rep., 354; Railway v. Eddins, 26 S. W. Rep., 162, and cases there cited. From the character of the shipment and the nature of the injuries sustained by the cattle, it could not with any degree of certainty be ascertained what was the character of injuries and their extent until the cattle had arrived at East St. Louis, the point of destination. The facts pleaded do not show that there was any agent at that place to whom notice could be given, and do not show that the appellee could by the exercise of reasonable diligence have ascertained who was the proper person to receive such notice, and that he was accessible for such purpose. The injuries in the main consisted of a loss in weight of the cattle and a deterioration in their value by reason of failure to expeditiously transport them and to properly care for them. In the nature of things this could not be well determined until the cattle had reached their final destination, as this effect was produced not at any particular place, but was the result of the general treatment that they received all along the line. A stipulation under such circumstances requiring a notice of the injuries to be given short of the point of destination, and before those injuries are fully developed and could in their extent and nature with reasonable diligence be ascertained, is unreasonable.

What has been said was upon the basis that the written contract of carriage was the contract by virtue of which the cattle were shipped; but now we approach the question whether that contract in any particular under the facts of this case is valid and binding, and whether it is supported by a consideration so as to supersede the parol contract that was entered into for the shipment of the cattle. This, we consider, is the important question in the case.

The facts, without contradiction—except in so far as a contradiction may arise solely from the naked fact that appellee signed the written contract—are to the effect, that prior to the execution of the written contract the appellant, through its agent, and the appellee, through

his agent, entered into a verbal engagement, based upon a freight rate of 43 cents per hundred pounds weight (the same rate stated in the written contract), whereby appellant agreed to transport the appellee's cattle, with that of other parties, from Maxwell, Texas, to East St. Louis in a special train, and to make a special run and to deliver them in the National Stock Yards at East St. Louis not later than 6 o'clock a. m., May 31, 1892, so as to get them there in time for that day's market, which closed at 2 o'clock p. m., and the cattle were to be carried through to Vinita, and there unloaded, and watered and fed and rested for ten hours, and then carried through to East St. Louis. It is shown that the custom of appellant and other carriers is to permit the free transportation of the shipper to and from the place of destination of the shipment, when so many cars are shipped. It was also agreed, that the cattle should be delivered to appellant at Maxwell for shipment by 1 o'clock p. m. the Saturday preceding May 31, 1892. The rate of freight agreed upon in this contract was the same rate stated in the written contract, and those provisions of the written contract stating that the shipment was to be within a reasonable time, and limiting the liability of the carrier to its own line, and setting out stipulations that would relieve the carrier from liability if the shipper did or failed to do certain things are not a part of the parol or verbal contract of shipment, and were not discussed or in any manner agreed upon when the parol contract was made, or before or at the time of the delivery of the cattle to appellant, and the facts show that no new consideration was paid or promised as a basis for the written contract. The appellee delivered his cattle as agreed upon to appellant, and it received them and they were placed in and loaded upon the cars of appellant, ready for shipment under the verbal or parol contract, and after they were so delivered, and upon the cars for transportation, and a very short time before they were carried on their way to the agreed market, the appellant presented the written contract of shipment to appellee, already made out, and it was signed by appellee. At 'the time it was received and signed, the appellee only looked at it to see if the freight rate was the same as agreed upon, and that at that time he did not read it before signing, and he did not have time to do so before the train on which his cattle were loaded, and with which he traveled, left Maxwell on its way to East St. Louis. The appellee, without being contradicted on this point or any other, testified: "Our cattle had been loaded and the cars sealed, and just about the time the train was due to start the agent presented us with a printed form to sign. I signed the one presented to me, but did not read it, and did not know what was on it; did not have time to read it then if I had wanted to read it. I went through with my cattle. I have always signed these printed forms like the one I signed in shipping stock. They will not ship your cattle if you refuse to sign them. After our cattle were loaded and the train due to leave, the agent told us to come in and sign the papers. The agent made it out and I signed without reading

it. At Vinita we were required to sign other papers by the Frisco road. The printed instrument signed at Vinita I used as a pass to come on from St. Louis to Vinita, and from Vinita to Maxwell I used the one I signed at Maxwell. The agent at Maxwell presented the instrument to me for signature already filled up. I knew nothing about the contents of the instrument. I have never seen any of the documents posted up in the defendant's office. I could not have unloaded my cattle and kept them without great inconvenience and loss. These papers I have been in the habit of signing are used as passes." The facts show, that the rate of freight agreed upon was the usual tariff rate to East St. Louis for cattle. This in the main is the evidence showing the circumstances under which the written contract was signed. The facts in the record show that appellant violated the terms of the parol contract sued on, and the facts also support the verdict of the jury as to damages sustained by reason of the breach of that contract.

From these facts three objections may be urged to the written contract, either of which, in our opinion, is fatal to its validity: 1. A want of mutuality, as the minds of the parties to it never mutually met and agreed upon some of its essential features. 2. There was no consideration deemed valuable that gives it support. 3. By reason of the peculiar facts and circumstances under which it was executed, it is unjust and unreasonable in the eye of the law.

It is apparent from the facts as stated that some of the prominent features of the written contract set up by the appellant, and which the appellee is charged to have violated, are essentially different from the parol contract sued upon. These distinguishing features between the two contracts were not discussed between the parties, nor was there any understanding or negotiations as to these matters previous to the pretended execution of the written contract, nor was there any at that time. In fact, at no time was there any understanding or agreement that a written contract was to be executed, but, upon the contrary, it appears that the rights of the parties rested upon the parol agreement in connection with the common law liability of the appellant as a common carrier. There was no agreement up to the time the written contract was signed that restricted or limited the common law liability of the appellant. The appellee, previous to the time of signing the written instrument, had delivered the cattle to the appellant under the parol contract, and had up to that time complied with all of its conditions. The written contract in question was not signed understandingly—with a knowledge of its terms and conditions.

Under this state of facts, can it be said that the written contract in question was a mutual agreement, and that the minds of the parties had met upon its essential features? We think there can be but one answer to this question, notwithstanding the theory of some authorities, that hold that an execution of a bill of lading by the shipper with restrictive conditions estops him from denying that he assented to its terms. In cases where the courts have so held, it appeared that

the execution was concurrent with the delivery of the goods for shipment. This is a distinguishing feature from the facts of this case, for here it is clearly shown that the goods had been delivered to the carrier and received by it previous to the time the written instrument was signed and delivered. Gaines v. Transportation Co., 28 Ohio St., 439. But to the extent that the doctrine of these cases may be opposed to our views, we think they should in reason yield to the principles asserted in that line of authorities that hold that where goods are delivered to a carrier under a verbal contract, not limiting its liability, and afterwards an instrument limiting the carrier's common law liability is delivered or executed, it must be upon the knowledge and assent of the shipper, or that he knew there were some special terms imposed upon him in the written instrument, and that he was willing and content to accept them without examination. Express Co. v. Stettaners, 61 Ill., 186; Railway v. Reynolds, 17 Kas., 254; Railway v. Boyd, 91 Ill., 271; Bostwick v. Railway, 45 N. Y., 715; Gaines v. Transportation Co., 28 Ohio St., 437; Gott v. Dinsmore, 111 Mass., 52; Railway v. Jurey, 111 U. S., 591, 592; Railway v. Manufacturing Co., 16 Wall., 324; Navigation Co. v. Bank, 6 How., 382; Railway v. Barrett, 36 Ohio St., 452; Railway v. Campbell, 36 Ohio St., 658; Transportation Co. v. Leysor, 89 Ill., 45; Railway v. Cravens, 20 S. W. Rep., 803–807; Railway v. Lockwood, 17 Wall., 359; Express Co. v. Moon, 39 Miss., 832; Transportation Co. v. Dater, 91 Ill., 195; Levering v. Transportation Co., 42 Mo., 88; Express Co. v. Haynes, 42 Ill., 89; Express Co. v. Spellman, 90 Ill., 456; Adams v. Buckland, 97 Mass., 124. Also the decision of the House of Lords in Henderson v. Stephenson, L. R. Sc. & Div. App., 470; Parker v. Railway, High Court of Justice, 25 W. R., 97; 5 Cent. Law Jour., 134; 3 Am. and Eng. Encyc. of Law, 859; 2 Id., 822; 2 Rorer on Rys., p. 1320.

Conceding that in this shipment—it being interstate—the carrier could by contract limit its common law liability except in instances that would relieve or excuse it from its negligence, still the authorities cited have peculiar force, and in effect hold, that a carrier who seeks to relieve itself of its common law liability must aver and prove a contract to that effect. 2 Rorer on Rys., p. 1239; Railway v. Manufacturing Co., 16 Wall., 328, 329; Navigation Co. v. Bank, 6 How., 383; Express Co. v. Backman, 28 Ohio St., 144. The doctrine of these authorities, broadly stated, is to the effect that the assent of the shipper to such special arrangement must be shown, and that when it appears that such assent was not given, and the facts repel any reasonable inference from which it may arise, such stipulations relieving the carrier from its common law duties will not be binding. The rule upon this subject, in keeping with that announced in the cases cited, is tersely stated by the Supreme Court of Mississippi in Southern Express Company v. Moon, supra.

"The *public policy* on which the extraordinary liability of common carriers is founded is too important to be thus virtually repealed by the fraud and circumvention of artfully contrived, printed, or prepared receipts thrust upon those to whom the hurry and press of railroad travel denies the time of examination, or the opportunity of *fair assent.*

"As the case before us does not necessarily call for a review of the cases on this point, we shall concede for the present that the number of cases sanctioning this doctrine greatly preponderate in favor of the right of limitation by special contract. But in such cases express assent, with a full knowledge of the terms of the special contract and of the legal rights thereby waived, as well as a consideration for such waiver on the part of the consignor, must exist. And if it be merely doubtful whether the consignor *intended* to waive his legal rights, public policy requires that they should be presumed and upheld.

"Exceptions inserted in the receipts of carriers are generally construed strictly against the carrier; and notwithstanding the exception, the burden of proof still rests upon the carrier to exonerate himself from liability, by showing a loss of the goods from a cause within the exception.

"Where, as in the case of carriers, a public duty is imposed by law, and it is sought by special agreement to avoid that duty, no *implication* can be indulged to support such an agreement; but an actual contract, assented to in fact by both parties, must be shown. Edw. on Bailments, 486–488; 19 Wend., 234–247; 6 How. (U. S.), 334."

In contracts of this character, when the shipper signs the contract, this may be prima facie sufficient evidence of its execution, and that the shipper assented to its terms, but contracts of this character, by reason of the unequal situation of the parties, and of the duties of the carrier and its liability under the common law, and of its restricted rights by reason of its public duty to the commerce of the country, stand upon a different footing than contracts between individuals (16 Wall., 329; Lockwood case, 17 Wall., 378–384; 5 Cent. Law Jour., 134; 20 S. W. Rep., 803; 12 Id., 1018; 17 Kas., 252; the Leysor case, 89 Ill., 45; Dater case, 91 Ill., 195; the Jurey case, 111 U. S., 591); and in view of this, evidence independent of the contract is admissible to show the true situation of the parties to the contract, and the circumstances under which it was entered into. The authorities cited in part to some extent adjudicate contracts between the shipper and the carrier that arise out of notices to the shipper of regulations under which the shipment was made, and also from receipts or bills of lading that were delivered to the carrier after goods were delivered for shipment. The rule laid down in these cases, that the shipper is not bound by such regulations or the terms of the bill of lading that restricts the carrier's common law liability, unless he knew of their terms and conditions and assented to be bound by them, ought to in reason find application in a case where it is shown that the ship-

per, although he signed the contract, did so under circumstances that show that he did not know of its terms, and had not a reasonable opportunity to so inform himself before he was required to sign it. The want of assent exists as much in one case as in the other; and when we consider the legal effect of a bill of lading as showing prima facie the contract between the parties, and that the acceptance of such a contract by one of the parties to it, although he did not sign it, is as equally binding upon him as it is upon the one that formally executed it (Ryan v. Railway, 65 Texas, 17; 85 Texas, 602); and when, as we have seen, it is steadily held that although this fact may appear to exist it may be shown differently, we see no reason why a written instrument signed by the shipper would not be subject to the same rules, and why it may not be explained by evidence showing the true situation of the parties and the true contract under which the shipment was made. If it is permissible in the one case to prove what was the real contract, reason suggests that such procedure is also admissible in the other case. The primary inquiry is one of assent, and when it is shown that the shipper relied upon a parol agreement of shipment and upon the common law liability of the carrier, a written contract restricting the liability of the carrier differently from that actually made or created by common law should not prevail when the shipper did not know its contents and assent to its terms. In such a case, the assumption of assent that springs from the fact that he signed it may be rebutted. The issue then becomes one of fact as to which contract is binding. Under the facts of this case there can be no question concerning this issue, as the facts without contradiction show that the appellee did not know the contents of the written instrument at the time he signed it, and that an opportunity for its examination was not given him before he was required to sign it, and that it was not signed until after the cattle had parted from his possession to that of the carrier by virtue of the parol agreement. The element of assent and mutuality that must exist in order to make the contract valid is wanting in such case, and as to the written contract shown by the record, it is clear that the minds of the parties never met or agreed as to its terms.

The next question to be considered is, was the written contract supported by a consideration deemed valuable in law? A contract in writing shown to have been voluntarily signed by the party sought to be charged may be presumed as resting upon a consideration; but whatever may be the presumption, if any, that exists in such a case, it is clear that such presumption is not conclusive, and that it is permissible, under a proper pleading raising the issue, to show either a failure of consideration or a want of consideration. The facts of this case show that the freight rate for the shipment of the cattle was the same in both the parol and written agreements, and that the cattle were actually delivered to the carrier under the parol contract, and that nothing of value passed between the carrier and the shipper at

the time the written contract was signed. The carrier's duties under the parol contract, in connection with those imposed by the common law, were to ship the cattle to the destination agreed upon, and its liability as a common carrier became fixed when the cattle were received by it for that purpose. These are the conditions under which it received the cattle and agreed that they should be so shipped through to their destination at an agreed rate of freight. Subsequent to this, the appellee signed the written instrument that is set up by the carrier as the contract between the parties. It is true that this written agreement releases the carrier under certain circumstances that did not exist in the parol agreement, and imposes upon the shipper certain duties that were not covered by the parol contract, and in this sense it may be said that the carrier has received a benefit that did not previously exist; yet still there is no corresponding benefit or advantage to the shipper given in the written contract, but, upon the contrary, it strips the parol contract of many of its features favoring the shipper without any pecuniary benefit to him. The liability of the carrier had become fixed under the parol agreement, and its duty was by virtue of that contract to ship the cattle and safely deliver them. This duty rested upon it independent of the written contract, and the execution of that contract did not hasten its duty in this respect, nor impose any terms or conditions upon it that did not previously exist; but its tendency in important directions was to relieve it from the engagement already existing. Suppose that the parties had entered into a valid contract in which it was agreed that the carrier would purchase the cattle from the shipper and the carrier received the cattle under the contract, and, subsequent to the accrual of its liability, an agreement was entered into, without any advantage or pecuniary benefit or otherwise accruing to the shipper, in effect, to release the carrier altogether from its promise to pay what it was due and owing as the purchase price of the cattle. The carrier by virtue of such an agreement receives a benefit, but could it in reason for a moment be urged that such subsequent release of the carrier from its lawful obligation to pay the contract price of the cattle was supported by a consideration? The statement of such an illustration is argument sufficient as an answer to the question. Such in effect is the case we have before us. It is clear under the facts that the contract in question is not supported by a consideration. Railway v. McCarty, 82 Texas, 609; Railway v. Reynolds, 17 Kas., 251; 20 S. W. Rep., 803; Express Co. v. Moon, 39 Miss., 832; Railway v. Gilbert, 12 S. W. Rep., 1019; 5 Cent. Law Jour., 134, and cases there cited; 3 Am. and Eng. Encyc. of Law, 890, and notes.

The remaining discussion is addressed to the question whether under the facts the written contract was fair, just, and reasonable in the eye of the law. The recognized doctrine of the day is that railways, in the attitude and relation in which they stand to the commerce of the country, are public carriers for private gain, and that their duty to the

public and the shipper requires that obligations and engagements which they enter into for the transportation of goods shall be based upon contracts that are essentially fair, just and reasonable, not only to the carrier but to the shipper. The rule of public policy that condemns such engagements that are unreasonable, unjust and unfair to the public and the shipper finds sanction in the modern judicial utterances upon this subject, and the legislation of the day, which in this direction is almost universally sustained by the courts. The doctrine finds support in many cases, among which are: Express Co. v. Moon, 39 Miss., 832; Lockwood case, 17 Wall., 359; Pratt case, 22 Wall., 134; Burke case, 55 Texas, 333; Railway v. Garrett, 24 S. W. Rep., 354; 2 Am. and Eng. Encyc. of Law, 811–836; Railway v. Gilbert, 12 S. W. Rep., 1019; Railway v. Cravens, 20 S. W. Rep., 803; Railway v. Manufacturing Co., 16 Wall., 328.

When we consider the duty that these carriers owe to the public, and the aid and benefits they have received from that source, and the virtual control of the transportation of the commerce of the country that now lies in their hands, and the unbridled license that may prevail in imposing upon the shipper terms that may in effect relieve the carriers from all of their statutory and common law duty in the premises if this check did not exist, we can not well with reason question the soundness of the doctrine quoted and the rule of public policy upon which it rests. For whatever may be the theory of the law that parties sui juris, when voluntarily contracting with their eyes open, will be held to their promises and engagements, although they bear with burdensome and disastrous weight upon one, with a resulting advantage and benefit to the other, it must be conceded that, discarding the theory and looking to the conditions of the carrier and shipper as they actually exist in making their contracts, the advantage is on the side of the carrier, and it is in an attitude to impose upon the shipper, who finds himself in the necessity of resorting to the means offered by the carrier for transporting his products to a market, just such terms as it may see fit to impose. Lockwood case, 17 Wall., 359. The shipper presents to the carrier his goods for transportation to a market, and it accepts them for that purpose, only upon conditions that are burdensome and unfair to the shipper; otherwise the shipper is informed, that unless the terms dictated by the carrier with reference to the shipment are accepted they will not be received. What choice has the shipper? He must accept the terms or lose the benefits of the sale of his goods in the desired market, or he must resort to a court of law for redress in damages for failure of the carrier to receive and ship the goods, and this with the expense of litigation and with the hazard and uncertainty that exist in nearly all legal battles. The unequal position of the parties in their contractual relation to each other commends the wisdom of the doctrine that requires the carrier to deal fairly with the shipper, and that prevents it from imposing unjust and unfair contracts upon him.

In the absence of a contract previously entered into, the carrier was bound under its common law duty to receive for shipment cattle or other property when tendered within seasonable hours and upon reasonable notice (20 S. W. Rep., 803; 39 Miss., 823; 17 Kas., 255; 2 Rorer on Rys., 1221), and it may also legally enter into a parol contract of shipment (111 U. S., 591; 61 Texas, 495), and when so entered into it will be binding upon the parties as the contract regulating the shipment, unless voluntarily and mutually changed or abandoned. And it is well settled that a carrier is not ordinarily bound beyond its own line, but it may by contract become bound for delivery at the final destination of the shipment, although it extends beyond its line. 22 Wall., 132.

We will view the facts in the light of the principles of law stated, in order to see if the written contract will stand the test fixed by the law in determining if it is just and reasonable. Up to the time of its execution there was a valid parol contract of shipment by which the appellant agreed to transport the cattle to their final destination and deliver them there to the shipper. There were no limitations by the terms of this contract placed upon the carrier's common law liability, nor was there any agreement in the premises that relieved or absolved it from any of its duties and liabilities as a common carrier under this through contract of shipment, nor were there any duties imposed upon the shipper, the nonobservance of which would relieve the carrier from its full liability under the law. The cattle were actually delivered and placed on board the cars under this contract, and under this state of facts, and when the train upon which they were loaded was about ready to start upon its journey, the written contract was presented to the shipper, and he signed it without reading it or without being informed of its contents, and, by reason of the early departure of the train, without time sufficient to become acquainted with its contents. From the evidence in the record, the inference is fair that if he had not signed it the carrier would have refused to ship his cattle, and as a result he would have been greatly damaged, and deprived of the benefits of a sale in the market for which he had contracted. The written contract limited the liability of the carrier to its own line, which, it appears, ended at Vinita, Indian Territory, and contained provisions limiting or exempting it from liability to an extent not covered by the parol agreement, or its duty generally as a common carrier under the common law.

The great volume of case law upon the subject, holding that contracts of carriers in order to be binding upon the shipper must be just and reasonable, relate in the main to certain provisions or stipulations of such contracts which are declared illegal, although voluntarily entered into, and permit other portions of the contract that are reasonable and just to remain intact and binding upon the shipper. But we do not see why the rule and doctrine announced by these cases—which is the correct one—may not be applied in a condemnation of the contract as a

whole and in its entirety, when it is shown that it sprang into exist-
ence under circumstances that would make it unjust and unfair to the
shipper to impose it upon him.   The unreasonableness and unfairness
of the contract may arise from the circumstances that caused its exe-
cution and from the acts and conduct of the carrier at that time, as
well as from the unfairness and unreasonableness of some of its terms.
The test required is, that the contract must be reasonable, just, and
fair, and when these elements are wanting it should make no differ-
ence how they arise, whether from the manner and circumstances of
the execution of the contract, or from the vice of some of its special
provisions, as in either case the vice exists; and when it is thus dis-
covered, the policy of the law is to denounce it.

In pursuing the question further, the argument we would use is so
well and thoroughly outlined in the case of Railway v. Cravens, 20
Southwestern Reporter, 803, by the Supreme Court of Arkansas,
through Justice Hemingway, that we set out the case in full:

"The plaintiff sued to recover the value of cotton that was burned,
without fault of the defendants, while they held it for shipment.   The
defense was, that the defendants were exempt from liability by the
terms of the bill of lading under which they received the cotton.   It
was alleged in the complaint, and admitted in the answer, that the
defendants operated a line of road from Hartman, where the cotton
was received, to the several points of consignment, and that they re-
ceived the cotton under bills of lading containing provisions to the
effect that they should not be liable except for losses occasioned by
their negligence; but it was alleged that said provisions were void, for
the reason that they were without consideration, unfair, unjust, and
unreasonable.   To sustain his contention, he proved that the defend-
ants fixed and published a uniform rate for carrying cotton between
said points, and that his shipments were made according to that rate;
that the defendants furnished to their agent at Hartman printed forms
for bills of lading that were uniform in their terms, and contained the
provisions relied upon in this case; and that said agent had no author-
ity to receive, and would not have received, the cotton except under
said bills.   It is shown, that the plaintiff knew that the bills contained
the provisions relied upon, and that he made no objections to the rate
fixed or the provisions contained therein.   There were other facts
proved, but, as we understand the law, they do not affect the case
made.   There was no serious controversy as to the amount of plaint-
iff's loss, and it is not now insisted that the verdict was excessive.

"The contention is, that the court erred in directing the jury upon
the law regulating the provisions of the bills of lading providing for
defendant's exception from their common law liability, and no objec-
tion is made to its directions upon other principles of law.   We deem
it unnecessary to set out or consider seriatim the several instructions;
for, in stating our views of the law, we determine all questions arising
upon them that are material in this case.   If, upon the case stated, the

provisions are deemed valid in law, the defendants have a perfect defense, and the action should be dismissed. On the contrary, if the provisions are deemed invalid in law, the defendants have no defense, and no error in the court's charge could have prejudiced them. That is, the judgment should be reversed or affirmed, according as the contracts are deemed valid or invalid.

"It is contended that they were invalid because they were without consideration, but we have not deemed it necessary to enter upon the consideration of this question. The further objection urged to them is, that they were unfairly obtained, and are therefore unjust and unreasonable in the eye of the law. To maintain this position, it is urged that the plaintiff had an absolute right to demand that defendants receive and carry his cotton under their accountability at common law, but that he could procure them to do it only by accepting the bills offered, and that for this reason his agreement to the conditions of the bill was not fairly obtained, and they should be adjudged unjust, unreasonable, and void. To this the defendants reply, that there is nothing to show that the terms of the bill were unjust or unreasonable, and that, as plaintiff understandingly accepted them, he is conclusively bound by them.

"There are principles of law pertinent to the case that are well settled, among which may be stated the following: That a carrier is bound to receive and carry all articles tendered him of the kind that he engages in carrying; that in performing that service the law casts upon him the accountability of an insurer, unless he takes the service in the particular case under a special contract with the shipper restricting his liability; that a carrier can by no act of his own modify his liability, but that every modification must arise out of a contract fairly made, and just and reasonable in its terms. It follows from the principles stated, that the law deems it just and reasonable to hold the carrier to the duty of carrying with the accountability of an insurer, if the shipper so wish; so that the carrier can neither decline to perform the service, nor, of his own motion, escape that extreme accountability. He is authorized to contract with the shipper for a restricted liability, but such restriction depends upon the consent of the shipper. He has the right of choice between the common law undertaking and any special contract that the carrier may wish to make, and the making of a modified contract must represent his choice. But, although his consent is an indispensable element in such contract, it is not conclusive of its validity; for the law will permit the carrier to be released from his common law liability, not upon every contract to that effect that would be valid if it related to other matters, but only in pursuance of a contract fairly made, the terms of which are deemed just and reasonable. So that, while a carrier claiming an exemption must show a contract providing for it, even this will not avail him, if it appear to be unfair, unjust, or unreasonable. Whether the agreement relied upon in a particular case satisfies the requirements of the law,

as regards its terms and the manner of its procurement, must be determined in view of the rights and duties of the parties, the policy of the law in defining them, and the tendency of the contract to conserve or to violate such policy. If an intending shipper should be refused transportation because he would not make a special contract, he might desist from shipping, and hold the carrier for damages. Of this there can be no doubt, and we do not understand that defendants question it. If it were otherwise, the carrier could refuse to perform a service, the performance of which is its primary duty, and justify upon the ground that its intending customer declined to release him from a liability which the wisdom of the law imposes on him; and, while the law will not permit him to restrict his liability, it would thus recognize a restriction due to what, viewed practically, was no less than his compulsion. This in effect would authorize him to abrogate a rule of law designed to hold him to a discharge of his duties; and the law does no such foolish thing as to prescribe regulations and vest the party to be regulated with the right to repeal them.

"Taking it to be settled that a refusal to carry except upon such condition is a wrong, and that one intending to ship, who declines to do it upon such terms, has a right of action for his damage, we are next to consider what his attitude is, if, instead of declining to ship upon the condition, he elects to ship, and accedes to the condition in order to obtain transportation. The law, as we have seen, deems it the best policy that the carrier should bear the general liability of an insurer, except where his customer consents to bear a part of the risk, in which case it seems to contemplate that the terms upon which such consent is given will guard and preserve the public interest. But the consent meant is certainly not a constrained submission to terms imposed—not a consent extorted by what the law characterizes as 'duress,' nor what is practically, as society is organized, the same thing; but it is what Mr. Pomeroy calls an 'absolute consent'—a consent that implies a physical, intellectual, and moral power, freely and deliberately exercised. Consent of a different kind may be, and often is, all that is required to make a contract binding at law, and even in equity; but it can not make a contract fair, just, or reasonable. As a rule, the validity of a contract in nowise depends upon its fairness, nor the justness or reasonableness of its terms, nor the adequacy of the consideration, provided it rests upon one deemed valuable. Nor will it be invalidated by reason of the fact that the party was in pecuniary or other necessity or distress, provided it was intelligently and freely made, without the use of undue pressure. If the party freely and intelligently elect to make a hard, unequal, and unjust contract, the courts will not make a better one for him, or relieve him of the one made, merely because he was in straitened circumstances, and it seemed to him necessary to make it in order to secure relief. The courts decline to thus hamper the independence of the individual, or limit his right to make his own contracts. Such functions pertain to

paternal, and not to free, government. But relief is withheld upon the ground that the party had his choice between not acquiring the benefits accruing under the contract and acquiring them according to its terms, and had intelligently and freely exercised his choice, and elected to take the benefits of the contract. The reason does not apply where the party acquires nothing under the contract, and is constrained to consent to it by reason of the fact that the other party had made this agreement necessary to the enjoyment of an important and apparently indispensable privilege, to which he was already entitled. But even when a party by an unequal or unjust contract, made without duress or misrepresentation, acquires something to which he had no other right, courts of equity have shown a disposition to relieve him, where it appeared he was in pecuniary necessity or distress that impelled him to make an undue sacrifice, and advantage was taken of such condition. 2 Pom. Eq. Jur., sec. 948; Buford v. Railway, 82 Ky., 286; Brown v. Hall, 14 R. I., 249; 1 Wharton on Con., sec. 170. Upon this principle, contracts to pay unconscionable interest, where no usury laws are in force, and to transfer expectant estates for considerations grossly inadequate, have been declared void. Miller v. Cook, L. R., 10 Eq., 641, and cases supra. Without committing this court to the doctrine of those cases, to the extent of holding that an advantage taken of one's necessities or distress to obtain a hard bargain will afford ground for equitable relief, we think it necessarily and properly deducible from them that it is not fair, just, or reasonable, in the eye of the law, to take advantage of one's necessities or distress to obtain a contract by which he releases some valuable right, or assumes some onerous liability—at least, where it does not appear that he received any corresponding benefit—and that, while the circumstances might not warrant the avoidance of an ordinary contract, they would defeat such a one as depends for its efficacy upon its fairness and just and reasonable terms.

"Applying the principle stated to this class of cases, the question is whether it can be declared, as a matter of law, that an intending shipper is under a necessity to agree to a special contract which the carrier proposes as a condition to receiving and carrying his property; and if so, whether it can be further declared, that the carrier takes an unfair advantage of his necessity to obtain the contract.

"It is a well known fact that the prosperity of the public collectively, and of its members individually, depends absolutely upon transportation and transportation agencies, and that the carrying business is mostly concentrated in a few powerful corporations, to a large extent controlling monopolies, natural if not legal, whose position enables them to control it. Circumstances, well understood, that exist without any design of the law, give them the power to shape the carrying business, and impose upon it such conditions as they see fit. Every demand it makes represents the will of its aggregate being, backed up by all its concentrated powers. The public, in meeting

such demands, acts separately, and not collectively. The individual stands alone, and can oppose to the demand, coming from such concentration of corporate power, the influence of but one member of the vast aggregate that comprises the public. Whether he gives the carrier his patronage, or does not, matters but little to the latter; but whether the carrier transports his property promptly and safely, will perhaps determine whether he succeeds or fails in business. If he declines the terms proposed, and refrains from shipping, he has no adequate redress. If he sues to recover his damage, he is subjected to all the delay and expense incident to such litigation, and at last recovers only what the law regards as his damage, and must himself stand— what would generally be much greater—the loss which the law deems too remote to estimate as damage. If he withholds his patronage and attempts by this means to induce the carrier to recede from his terms, he can accomplish nothing, for his business is too small to make his patronage material, and besides, if his property is to be transported, he must at last deliver it to the exacting carrier, for, from the nature of the business, he can rarely find any other, so that he would only have postponed giving his patronage, and the delay in shipment, that may have been very detrimental to his business, would not be appreciable to the carrier. In considering the relative positions of the parties, Judge Bradley thus states his attitude: 'He is one individual of a million. He can not afford to higgle or stand out and seek redress in the courts. His business will not admit such a course. He prefers rather to accept any bill of lading, or sign any paper, the carrier presents; often, indeed, without knowing what the one or the other contains. In most cases, he has no alternative but to do this or abandon his business.' Railway v. Lockwood, 17 Wall., 379. The Supreme Court of Michigan, with reference to the same subject, thus define the attitude of railroad companies. 'They do, and necessarily must, absorb nearly the entire business of carrying merchandise and property requiring carriage and deposit along and in the vicinity of their route, and competition is virtually destroyed. There is, in a certain sense, a compulsion upon all requiring transportation to employ them; and a restriction of liability by notice is measurably compulsory. There is no mutuality or freedom of choice offered. The person desiring to have goods forwarded is compelled, in reality, to have them carried forward by the company. The obligation is to carry them; and a restriction of the liabilities primarily growing out of that obligation by a notice is an imposition of terms rather than a contract.' Railway v. Hale, 6 Mich., 258; Railway v. Eubanks, 48 Ark., 460; 3 S. W. Rep., 808.

"Why, we would ask, is restriction by express agreement, if necessary to obtain transportation, less compulsory, less an imposition of terms, or more in the nature of a contract? The unequal condition of the parties is the same in either case. The necessity of the one to obtain transportation, and the control of it by the other, exist in either

case.  The only difference between the agreement by notice and that by writing in the bill of lading is, that in the one consent is implied, and in the other express; but in either case the party is bound to give it in order to enjoy a privilege of great, and possibly vital, financial importance to him.  The agreement in neither case embodies the free and deliberate consent of both parties; for one did what he felt bound to do, while the overmastering influence of the other enabled him to embody his will in a formal contract.

"The relative position of the parties must be well understood by both of them—by the individual desiring to ship property, and the carrier to whom it is offered.  The individual feels that transportation is necessary to his success, and that unless he gets it promptly he will suffer inconvenience, and perhaps loss.  He regards the probability of loss in transit as remote, and knows that if there is no loss the contract is immaterial.  Under such circumstances he will assume the risk of contingent future loss, rather than sustain a loss that is certain and present, as men usually are prone to sacrifice contingent future interest to satisfy present wants.  So we think it should be held, as matter of law, that the parties stand upon a footing of inequality, and that individuals desiring to make shipments are under a necessity sufficient, in the ordinary affairs of life, to amount to compulsion, where it is pressed.  The question then is whether, in the case stated, a carrier, in making agreements exempting him from his common law liability, takes unfair or unjust advantage of the situation and of his customer's wants.  The answer seems plain, in the light of what has already been said.  The service is in fact an absolute necessity to the individual.  The carrier is by law bound absolutely to perform it.  It affects as well the public interest as that of the individual, and the law regulating it, recognizing the unequal footing of the parties, has regard alike to both interests.  Great and valuable powers and privileges are conferred upon the carrier, and in return for them, out of regard for the general good, the law exacts that he shall promptly perform it, without damage to property committed to him.  He accepts the grant upon those terms, enjoys its benefits, and thereby acquires a controlling influence in the body politic, and then declines to perform the service, except upon the condition that he be released from the accountability he assumed; that is, he will perform the service only upon the condition that his customer carry a risk which, except where his customer prefers to carry it, the wisdom of the law has imposed upon him.  This is a plain dereliction of a public duty; and it is wrong to the customer, since it deprives him of the right to have the service, and to choose whether it be performed at one price without risk to him, or at another partly at his risk.

"But it is said that, if the party knowingly consent to a special contract, no one else can object, and that he can not be heard to say that it was unfair, or that an advantage was taken of him, since he acted freely and intelligently.  This, as we have seen, is a mistake, for such

contracts affect the interests of the public, and are subject to public regulation; and besides, the circumstances do not warrant the assumption of fact that the party consented freely, but rather show that he submitted to terms that he was bound to accept when the other party deprived him of the opportunity to choose between them and the contract which the law entitled him to demand, for he was, as we have seen, as much entitled to be indemnified against loss in transit as to the service demanded.   The law imposes no necessity for an election between the two rights, and the carrier can impose none.   But the carrier's refusal to perform the service without a release of his liability takes away the right to choose which the law gives, and forces an election between rights that are not inconsistent.   Thus the carrier does a wrong, and thereby creates a necessity for the wronged party to give the consent relied upon; and the question is whether one who does a wrong that places another under the necessity of agreeing to his proposals takes an unfair or unjust advantage in the matter. It is the tyranny of power over dependence, and therefore unfair; the deprivation of a right, and therefore unjust.   The reply that the party knowingly consented under circumstances not constituting duress or fraud, and that this is conclusive against him, is not sufficient in law.   If it were, a contract knowingly made to release a carrier from liability for his negligence would be sustained; but we know that the law is otherwise.   It overlooks two important features of this class of contracts—the first, that the individual is at a disadvantage in dealing with the carrier, and is bound by force of circumstances to accept whatever terms are offered, because he has no reasonable or practicable alternative; the second, that such contracts affect the interests of the public, on account of which the law will suffer them to be made only when they are fair, just, and reasonable.

"In this case the plaintiff did not object to the contract proposed, or ask for a different one; but if he had, the agent could not, and would not, have entered into any other.   Does this affect the case? We think not, but that the case stands just as if the plaintiff had demanded a different contract, and agreed to the one accepted because he could get no other.   Carriers do their business in pursuance of a general plan, and of this the public are advised; and when the defendants adopted a plan, instructed their agent to pursue it, and authorized him to pursue no other, their customers were not called upon to ask a change of the plan, or a departure from its terms, in their particular matters.   They had a right to suppose that the agent would not deviate from his instructions, and the evidence shows that in this instance he would not.   Besides, if defendants prepared to do business upon one plan only, it should have been in accordance with their common law liability.   The public had a right to that service, promptly performed, and should not have been subjected to any delay incident to preparing to do it, or instructing agents with regard to it. If any customer were to be delayed, such as desired service under

special contracts, and not those who desired it under the common law contract, should have been subjected to the inconvenience.

"The case may be stated as follows: The defendants were bound to accept and carry the cotton as insurers. They prepared to do it, and authorized their agent to do it for them, only upon condition that they be exempt from such liability; and the plaintiff, being able to make no other contract for the carriage of his cotton, agreed to the one proposed. They contend that, though the law prescribes that such contracts shall be fair, just, and reasonable, the party's making it is conclusive as to those matters, in the absence of fraud or duress, as defined by law. We do not assent to the position, but hold that, to maintain the policy of the law with reference thereto, such contracts must be the free act of the party, and reflect his choice as between the contract to which the law entitles him and the one relied on. One which it was necessary for him to make by reason of his circumstances, and the carrier's refusal to make any other, is not fair to him, and would not be deemed just or reasonable in law, at least without a showing that its terms really conserved his interest. In other words, we think it would violate the policy of the law to permit contracts to be made restricting the carrier's common law liability, where the carrier does not afford his shippers an opportunity to contract for the service without such restriction. It may be that shippers would prefer cheaper service, with restricted accountability, to more expensive service, with unrestricted accountability; but they are entitled to a choice, and the carrier can not deprive them of it, either directly or by anything which amounts practically to its deprivation. In support of this conclusion, we cite the case of Railway v. Gilbert (Tennessee), 12 Southwestern Reporter, 1018. But, if we were without a precedent, we think the established principles and policy of the law could not be maintained upon a different conclusion. If carriers could maintain exemptions where the opportunity to make a contract without them was not afforded, the result would be that such contracts would be universal; and it would be better to state the law generally, as it would in fact be in every case, that the carrier was only liable for his negligence. But the law has, in its wisdom, established a different rule, which it is the duty of courts to conserve, rather than overturn."

The case of Railway v. Gilbert, 12 Southwestern Reporter, 1018, in some of its features, supports these views.

The shipper, under such circumstances as shown by the facts of this case, when he is forced to the alternative of signing such a contract or being denied the transportation to the desired market by the carrier, whose duty is to give him the opportunity to ship under terms, if he so desires, as would hold the carrier to its common law duties in the premises, or of the verbal contract under which the cattle were delivered, was in some respects under duress as affects his property. Cases supra, and 79 Ill., 130; 41 Ind., 313; 61 Ala., 595; 35 N. J. L., 89; Oliphant v. Markham, 15 S. W. Rep., 570. These cases maintain

the doctrine that duress may apply to property as well as to the person, and, when a party is required against his will to do that which the other has no right to exact of him in order to receive or enjoy the benefits and privileges that result from an ownership and a right of use in his property, that duress essentially exists, and that fact may be shown to avoid the contract. An obligation that springs from facts that show that it was not deliberately and voluntarily assumed, and that it was executed under circumstances that show duress, and that it was imposed upon the shipper under the circumstances as shown by the facts of this case, is essentially wanting in those elements of fairness that must exist in order for a contract such as that in question to be enforced.

In view of the fact that the evidence, almost without room for controversy, establishes the illegality of the written contract, the court below could have with propriety declined to submit any issue or question that may have arisen under that contract; therefore, there was no error in the charges complained of on this branch of the case.

The charge of the court on the measure of damages may not have been as full as it should have been, but we can not say that it was erroneous to the extent that it did submit that question; and if the appellant wanted a more full and complete instruction upon this subject it should have asked it, which was not done.

The evidence warrants the verdict and judgment of the trial court. The judgment is affirmed.

*Affirmed.*

Delivered February 20, 1895.

*A. B. Story* and *Baker, Botts, Baker & Lovett,* for appellants, argued a motion for rehearing. It was refused.