## TEXAS STEEL CO. v. TEXAS & P. RY. CO.
### No. 12821.

Court of Civil Appeals of Texas. Fort Worth.

July 8, 1933.

George W. Armstrong, of Fort Worth, for appellant.

Cantey, Hanger & McMahon, of Fort Worth, for appellee.

DUNKLIN, Justice.

This suit was instituted by the Texas & Pacific Railway Company against the Texas Steel Company to recover the sum of $2,014.-38, the amount paid out by plaintiff to Robert W. Hunt & Co. for testing steel and other materials manufactured by the defendant to determine whether or not plaintiff would consent to the use of such material in the construction of pier abutments and pedestals for a new double-track bridge which the plaintiff contemplated building near Fort Worth. The plaintiff had let contracts for such construction to independent contractors, such contracts requiring material to be used conformable to specifications of the American Society for Testing Materials.

Plaintiff alleged that:

"The defendant through its agents and employees, sought out this plaintiff, through its engineering department, for the purpose of having plaintiff approve the use of steel bars and other material manufactured and fabricated in its plant at Fort Worth, Texas, in the construction work aforesaid in which plaintiff was engaged and concerning which it had made and entered into the aforesaid contracts and other contracts as well. Plaintiff, in response to such solicitation as aforesaid on the part of defendant, required that inspections and tests first be made of defendant's material so to be used to determine whether such material in the judgment of plaintiff's engineer was suitable for said construction work, and also conform to the specifications of the American Society for Testing Materials. Without such tests plaintiff refused to entertain any proposal for the use of said defendant's material. Whereupon defendant agreed to such tests and that same should be made under the directions of plaintiff and by experts to be selected by the en-

gineering department of plaintiff, and further agree to repay and reimburse plaintiff for and on account of any and all expenditures made by plaintiff for that purpose, and further agreed that such inspections and tests should be made through a representative of the firm of Robert W. Hunt & Company.

"Plaintiff would further show that all and singular the foregoing agreements were had and made orally by and between plaintiff and defendant in or about the month of February, 1927, or early in March of that year.

"Plaintiff would further aver that thereafter, in confirmation of the foregoing oral agreements and understanding, the said defendant by its certain instrument in writing dated March 5th, 1927, (a copy of which is attached hereto marked exhibit 'A' and made a part hereof as if specifically incorporated herein) executed for and on behalf of defendant by and through J. K. Remsen, Assistant to the President of defendant corporation, thereunto duly authorized by defendant, did ratify said oral agreements with respect to said inspections and tests, the selection of Robert W. Hunt & Co., as the inspectors of said material, and did expressly agree and obligate itself, the said defendant, to pay the expense to be incurred by plaintiff in having said Robt. W. Hunt & Co. to make said tests and to reimburse plaintiff therefor."

According to further allegations in the petition the tests contemplated were made by Robert W. Hunt & Co., and for the services so rendered plaintiff paid to them the sum of $2,014.38, and a recovery was sought for the sum so paid.

Exhibit A, made a part of plaintiff's petition, reads as follows:

"Fort Worth, Tex., March 5, 1927.
"Mr. F. E. Mitchell, Chief Engineer,
"Texas & Pacific Railway Company,
"Dallas, Texas.
"My dear Mr. Mitchell:
"This will formally confirm our verbal advice to you yesterday that we will reimburse your company for any expense you may incur in assuring yourselves that any steel which we may furnish for the reinforcement of your structure is in strict conformity with the American Society for Testing Materials specifications for reinforcing steel of the grade you desire. In consequence of our conversation, we understand that you will have Robert W. Hunt and Company assign a representative to inspect our product as follows:

"1. Chemical analysis of each heat as poured.

"2. The preservation of the identity of each heat.

"3. Observation of each heat through rolling process and size and finish of bars.

"4. Personal selection of not less than two samples from each size bar from each electric furnace heat and the testing of these samples for conformity with American Society for Testing Materials specifications for new billet steel concrete reinforcing bars, structural grade.

"While the foregoing represents inspection which you indicated yesterday would assure you of the quality of the steel, should you later desire any further data, we will be very glad to place this in your hands through any agency you suggest and stand the expense of same. As we advised you yesterday, this is a matter which means a great deal more to us than the actual business presently offered and it is our desire to remove any question in your mind that the steel currently produced by this company may not conform to American Society for Testing Material specifications in every way.

"I wish to take this opportunity to thank you for the courteous hearing you gave Mr. Armstrong and myself yesterday and hope that we may have the pleasure, at some future date, to show you and Mr. Howes through our plant.

"Yours very truly,
Texas Steel Company,
"[Signed]    J. K. Remsen,
"Asst. to President."

In addition to a general demurrer and a general denial to plaintiff's petition, the defendant filed a special answer together with a cross-action; and after sustaining the general demurrer and special exceptions to that special answer and cross-action, the court rendered judgment in favor of plaintiff for the amount sued for; and the defendant has prosecuted this appeal.

The only complaint made here is of the action of the trial court in sustaining the demurrer and exceptions to appellant's special answer and cross-action. That pleading is of considerable length and we shall not attempt to do more than give its general purport. According to the allegations therein, before entering into its contract to pay for the inspection made by Hunt & Co., defendant entered into a contract with the contractors to whom plaintiff had let the contract for the structures in controversy to sell to them the reinforcing steel to be used by them in such work; and that plaintiff had not theretofore required such a test to be made of the steel to be used in such structures before the same should be used by the contractors; that defendant would have withdrawn its offer to furnish its steel to said contractors for use in said structures after learning that such test would be required but failed to do so at plaintiff's instance; exaction of such test was an unlawful discrimination against defendant and that defendant agreed thereto under duress in order to avoid

a breach of its contract with said contractors to furnish steel to them; that plaintiff and its engineers represented that they would permit the use of defendant's steel on the work then contemplated as well as in other structures which plaintiff might make in the future; that their only desire for inspection was to be convinced of the quality of defendant's products; and that defendant entered into the agreement to have such inspection made relying upon such assurances. It was further alleged that one of the inducements of the defendant to agree to such inspection was the defendant's expectation to furnish to the same contractors steel for further improvements to be made by the plaintiff.

It was further alleged that the inspection made by Hunt & Co. demonstrated that the steel manufactured by the defendant fully met the specifications of the American Society for Testing Material, stipulated in plaintiff's contracts with its contractors for that work; notwithstanding which plaintiff refused to consent to the use of defendant's steel in the work, and by reason of which the defendant's contract to pay for the test had wholly failed.

It was further alleged that the test required of the defendant as a condition for plaintiff's willingness to the use of defendant's material in such structures was unnecessary, and plaintiff's rejection of that material was an unreasonable discrimination and boycott of defendant's products, and that such discrimination was for the purpose of injuring the defendant, since the same tests were not required of other manufacturers of steel used in that structure.

The pleadings contained these further allegations: "Defendant further alleges that plaintiff's said inspectors Robt. W. Hunt & Company, at plaintiff's instance and request and as plaintiff's agents and representatives made said inspection in a manner not authorized or contemplated by said contract, that the said inspectors demanded that they be present when the scrap was charged into the furnaces, and when the steel was poured from the furnaces into molds, and that they take samples of such pourings and send the same to Chicago, Illinois, for analysis. That the said inspectors failed and refused to be present on many occasions when the steel was poured into ingots and that they rejected such ingots because of their absence; that they demanded of defendant that they make special pourings and rollings of special sizes in small quantities and keep the same separate and apart from its other stock, and made such inspection in such manner as to materially reduce its output and increase its cost of production, and the cost of and charge for inspection. That the defendant took samples of each pouring from its furnaces and kept the ingots poured for plaintiff separately and rolled the same separately, but that the said inspectors refused to accept any of the work of the defendant unless the same was supervised by them; and that as a result of said harsh and unreasonable and unauthorized inspection and the delays incident thereto, and the interferences with the ordinary and usual operation of defendant's plant, the cost of manufacturing said four hundred tons of steel was increased, towit, $13.00 per ton, and as a result defendant lost $10.00 per ton upon all of said steel instead of making a profit of $3.00 a ton; that but for the manner and method through which said inspection was made at the direction of plaintiff and its engineers, defendant would have made a profit of $3.00 a ton upon said four hundred tons, but because of the manner of said inspection it sustained a loss of $10.00 a ton or an actual damage of $5200.00. That the defendant made large quantities of steel that complied with A. S. T. M. specifications, towit, two hundred tons, of special and unusual sizes in order to care for its contracts with said customers, which were rejected by the said inspectors because they were not present when the same was poured and rolled, and which the defendant had to later sell at a loss of towit $15.00 per ton or $3000.00."

There were further allegations to the effect that but for the rejection of defendant's steel in the structures mentioned above, the defendant would have sold its products to the same contractors for use in other work done at a later date for the plaintiff; and in its cross-action the defendant sought a recovery against plaintiff for the loss of profits that would have been realized but for plaintiff's rejection of the steel manufactured by defendant.

The test to which the defendant assented was essentially one for arbitration, and the common law applicable to arbitration awards must govern in the determination of the merits of the defendant's special answer and cross-action. It is apparent from defendant's original contract that Hunt & Co., selected to make the tests, were not plaintiff's agents as alleged in the pleading; that the contract by its terms shows that Hunt & Co. was selected by both parties' arbitrators. Hence the allegations in the answer that Hunt & Co. made the inspection as plaintiff's agent at plaintiff's request must be considered as surplusage.

The further allegation to the effect that the inspectors demanded that they be present when the scrap was charged into the furnaces and when the steel was poured from the furnaces into molds, and that they take samples of the pouring for analysis, was not inconsistent with the authority conferred by the defendant's written agreement. Indeed, the terms of defendant's agreement necessarily contemplated that the inspectors

should be present and should take samples in order to make the tests.

■ Arbitrations are regarded by the courts with particular favor, and agreements for arbitration under the common law are binding upon the parties thereto. 4 Texas Jurisprudence, p. 662. And on page 700 of the same volume the following is said: "The practice for setting aside an award corresponds to that which obtains in an equitable proceeding to set aside a judgment subsequent to the term at which it was rendered."

We quote the following from 2 R. C. L. p. 396: "The award of arbitrators, acting within the scope of their authority, determines the rights of the parties as effectually as a judgment secured by regular legal procedure, and is as binding as a judgment until it is regularly set aside or its validity questioned in a proper manner. Their decision on matters of fact and law is conclusive, and all matters in the award are thenceforth res judicata, on the theory that the matter has been adjudged by a tribunal which the parties have agreed to make final, a tribunal of last resort for that controversy. And this has been held true even in a case in which one of the parties neglected to present portions of his claim." See, also, page 389 of the same volume.

We quote the following from 5 C. J. p. 179: "An honest mistake of judgment in the conclusion of arbitrators which does not exceed the bounds of the submission is not, as a general rule, ground of impeachment of the award, whether the alleged mistake is one of fact or of law, or of both. Although the court might have rendered a different decision, it will not substitute its judgment for that of the arbitrators. 'Such errors are among the contingencies which parties assume when they select such tribunals.'" On page 189 of the same authority it is pointed out that fraud, corruption, or misconduct of the arbitrators is ground for setting aside the award. And the following is quoted from the same volume on page 199: "In order to invoke equitable jurisdiction to set aside an award, the grounds upon which the relief is asked should be specifically alleged. And no others will be considered. Mere general allegations of fraud, partiality, or corruption will not suffice. The facts relied on as constituting these objections to the award must be stated." To a like effect, see page 203 of the same volume.

■ We have reached the conclusion that the defendant's pleading failed to present any sufficient basis for impeachment of the action of Hunt & Co. in making the inspection of the steel manufactured by the defendant and their decision reached as the result of such inspection. It is to be noted that the pleading contained no allegation that the inspectors acted fraudulently or that their action was induced by any fraud on the part of plaintiff; nor do the facts alleged show that the action taken by the inspectors was beyond the scope of the authority given them by the defendant's written agreement for the inspection of its steel.

■ Before the execution of the contract sued on by the plaintiff, the latter was under no legal obligation to allow the use of defendant's steel in the work then contemplated. The exercise of that right could furnish no proper basis for the claim, made in other allegations in the cross-action, to the effect that the act of plaintiff in demanding such tests of defendant's steel as a condition for plaintiff's permission to its use in the work was inspired by a desire to discriminate against defendant's steel in favor of that manufactured by other dealers, and that therefore defendant's action in agreeing to the tests required by plaintiff resulted from duress which vitiated the agreement to submit its steel thereto, and that therefore said agreement was without a valuable consideration to support it. See Knowles v. Gary & Burns Co. (Tex. Civ. App.) 141 S. W. 189, and authorities there cited (writ of error refused); Amuny v. Seaboard Bank & Trust Co. (Tex. Com. App.) 23 S.W.(2d) 287; Salado College v. Davis, 47 Tex. 131; Pye v. Cardwell, 110 Tex. 572, 222 S. W. 153; 12 R. C. L. p. 257; 26 R. C. L. pp. 757 and 760.

■ In the case of Missouri, K. & T. Ry. v. Carter, 9 Tex. Civ. App. 677, 29 S. W. 565, it was held that a shipper was not bound by a contract with a carrier which he is forced to make in order to have his cattle shipped to a desired market because of the carrier's obligation to make the shipment without such a contract. Likewise, in the case of Oliphant v. Markham, 79 Tex. 543, 15 S. W. 569, 23 Am. St. Rep. 363, it was held that a person is not bound by a contract which he is constrained to make in order to obtain goods to which he has title and which were unlawfully withheld from him. Those authorities have no application here, since in the absence of a contract to permit the use of defendant's steel the plaintiff was under no legal obligation to permit such use, and the exercise of its legal right of choice of material could furnish no defense to plaintiff's suit nor ground for damages sought in the cross-action. Manifestly, article 6474, Rev. Statutes, forbidding discrimination by railroad companies between shippers of freight, has no application here.

For the reasons pointed out, all assignments of error to the action of the trial court in sustaining the general demurrer and special exceptions to the special answers and cross-action are overruled, and the judgment is in all things affirmed.